# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACY MATTHEWS,<br><br>    Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>    Defendant. | 1:11-cv-01743-SKO<br><br>**ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT**<br><br>(Docket No. 1) |

## I. BACKGROUND

Plaintiff Stacy Matthews ("Plaintiff"), representing herself pro se, seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act. 42 U.S.C. § 405(g).

The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II. FACTUAL BACKGROUND

Plaintiff was born in 1966, has one year of college, and worked as an office clerk typist and a packer. (Administrative Record ("AR") 35, 49, 90, 119, 125.) On September 28, 2006, Plaintiff filed an application for DIB, alleging disability beginning on September 15, 2001, due to muscular dystrophies, other myopathies, hypothroidism, and myasthenia gravis. (AR 52-53, 90-92, 118.)

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (Docs. 6, 8.)

**A.   Medical Evidence**

Plaintiff was treated at Central Valley Medical Group from January 21, 2005, through August 2, 2005, for thyroid abnormalities. (AR 229-32.)

On July 28, 2005, Plaintiff was seen at Kern Medical Center by Victor Ettinger, M.D., who noted that Plaintiff has a history of hypothroidism dating back to 2001 and that a radio iodine ablation had been performed in 2002. (AR 182; *see also* AR 160, 169.)  Plaintiff did not remember the names of the medication she had been taking previously. (AR 182.)  Plaintiff complained of anxiety and fatigue. (AR 182.)  Laboratory work was ordered and Plaintiff was placed on medication. (AR 182.)

On September 20, 2005, Dr. Ettinger again noted that a radio iodine ablation on Plaintiff's thyroid had been performed in 2002. (AR 167.)  Dr. Ettinger reported that Plaintiff currently had hair loss and a hand tremor, and that the tremor was not improved by medication. (AR 167.)  Plaintiff's medication was adjusted. (AR 167.)  Dr. Ettinger also noted that Plaintiff's anxiety was "better." (AR 167.)  Plaintiff was scheduled to repeat the radio iodine therapy. (AR 167.)

On January 17, 2006, Dr. Ettinger noted that Plaintiff had not undergone the radio iodine ablation "due to 'personal problems.'" (AR 169.)  Plaintiff complained of anxiety and palpitations. (AR 169.)  The radio ablation was planned for February 2006. (AR 169.)

On March 28, 2006, Dr. Ettinger indicated that Plaintiff had undergone the radioactive iodine ablation on her thyroid in February 2006, which had been scheduled "due to persistent symptoms of anxiety, palpitation, [and] tremors." (AR 160.)  Plaintiff reported her symptoms "improved" since the treatment. (AR 160.)  Dr. Ettinger noted that Plaintiff had "[n]o muscle weakness, mental slowing, [or] confusion." (AR 160.)  Plaintiff, however, reported "persistent blurred vision" and was referred to the ophthalmology department. (AR 160.)

On April 10, 2006, Plaintiff was seen at Central Valley Medical Group for left eye problems. (AR 228.)

On April 28, 2006, magnetic resonance imaging ("MRI") of Plaintiff's orbits and brain was performed at Kern Radiology Medical Group, Inc. (AR 156-57.)  The MRI of the orbits indicated "[n]on-specific asymmetric outward gaxe of the right globe" but "[o]therwise no gross structural

abnormality or mass identified about either orbit or glove.  No parasellar or para-cavernous mass [was] identified." (AR 156.)  The MRI of Plaintiff's brain indicated "[c]erebellar tonsillar ectopia resulting in mild crowding, but no obvious compression." (AR 157.)  This was found to be "of uncertain, but doubtful clinical significance." (AR 157.)  The report also noted "[i]ncidental partially empty sella" but that "[n]o actue intracranial process [was] identified." (AR 157.)

On May 8, 2006, Dr. Ettinger noted that Plaintiff reported that she had been experiencing extreme fatigue for approximately a month and muscle cramps for one to two months.  (AR 162.)  Plaintiff also had blurry vision and ptosis (drooping) of the left eye.  (AR 162.)  Plaintiff's medication was changed.  (AR 162.)

On May 19, 2006, Plaintiff was seen by Vinutha N. Ravi, M.D., of Kern County Neurological Medical Group, Inc.  (AR 158-59.)  Plaintiff reported that "the droopiness started in the left eye and she now has droopiness in the right as well.  She has difficulty keeping her left eye open." (AR 158.)  Plaintiff stated that she developed "some diplopia" (double vision) in December 2005 when she was diagnosed with hyperactive thyroid; Plaintiff "received radioactive iodine" and was "now hypothyroid." (AR 158.)  Dr. Ravi noted that Plaintiff had an eye patch on her left eye.  (AR 159.)  Upon examination, Plaintiff had "lateral erectus palsy on the left side" with "bilateral ptosis; worse on the left side and mild ptosis on the right side." (AR 159.)  Dr. Ravi also found that Plaintiff had "bilateral diplopia on downward gaze," "weakness of the orbicularis oculi muscles," and "[n]ormal facial sensation [with] no facial asymmetry." (AR 159.)  Plaintiff was diagnosed with probable ocular myasthenia gravis.[2]  (AR 159.)  Follow-up testing was planned and Dr. Ravi noted that the ptosis improved when an ice pack was placed on Plaintiff's left eye.  (AR 159.)  Plaintiff was seen on May 22, 2006, by Dr. Ravi for a follow-up visit and testing.  (AR 154.)  Plaintiff was given an injection for the ptosis, and Dr. Ravi noted that there was "improvement." (AR 154.)  Plaintiff was prescribed medication.  (AR 154.)

---

[2] Myasthenia gravis is "an autoimmune disease of neuromuscular function" whose "characteristics include muscle fatigue and exhaustion that fluctuates in severity, without sensory disturbance or atrophy."  *Dorland's Illustrated Medical Dictionary* 1233 (31st ed. 2007) [hereinafter *Dorland's*].

Plaintiff was seen by Dr. Ettinger on September 5, 2006, for a follow-up visit, who noted that Plaintiff had peri-orbital edema, a patch on the left her, and eyelid droop.  (AR 165.)

On February 5, 2007, John Bonner, M.D., reviewed Plaintiff's medical records and completed a physical residual functional capacity ("RFC") assessment.[3]  (AR 189-95.)  Dr. Bonner determined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; could sit, stand, and/or walk six hours in an eight-hour day, and was unlimited in her capacity to push and/or pull.  (AR 190.)  Dr. Bonner stated that Plaintiff had limited depth perception and should avoid heights due to Myathenia.  (AR 191.)  Plaintiff had no other limitations.  (AR 190-93.)  Dr. Bonner opined that Plaintiff "should be capable of light RFC with some limitations, including for depth perception when eye patched."  (AR 195.)

On March 12, 2007, H.R. Waranch, Ph.D., performed a case analysis on Plaintiff's psychiatric state, finding that "[t]here is no evidence of psych treatment" and thus there was "insufficient info to determine if she has a severe mental impairment."  (AR 196.)

Plaintiff was seen at Central Valley Medical Group in April 2007, complaining of redness, soreness, and sensitivity to light.  (AR 225-26.)

On September 14, 2007, K. J. Loomis, M.D., performed a case analysis of Plaintiff's records.  (AR 241-42.)  Dr. Loomis noted that he spoke with Plaintiff on September 6, 2007, and she asserted that her physical problems had worsened and that she had not seen any mental health doctors.  (AR 242.)  Dr. Loomis noted that all of Plaintiff's problems with concentration, attention, and memory were directly related to her thyroid problems.  (AR 242.)  Plaintiff informed Dr. Loomis that, "since her initial application, her thyroid has been stabilized, which has basically rid her of the problems with concentration, attention and memory.  Her current complaints are physical."  (AR 242.)  Dr. Loomis affirmed the prior psychiatric analysis.  (AR 242.)

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

On October 26, 2007, Dr. De La Rosa reviewed the case analysis and affirmed Dr. Bonner's RFC assessment. (AR 242.) Dr. De La Rosa noted that Plaintiff stated "her hypothyroid condition has improved and while she has been alleging muscle weakness more proximal than distal[,] neuro exams did not support limitations except for pstosis [left greater than right]." (AR 242.) Dr. De La Rosa noted that "consideration for visual limitations was included in [the] RFC." (AR 242.)

On December 3, 2007, Plaintiff was seen by Andrew D. Ly, M.D., at LAC USC Medical Center Live ("LAC USC") for a follow up visit for suspected ocular myasthenia gravis. (AR 246.) Dr. Ly noted that reported that her symptoms had been stable since her last visit. (AR 246.) There was "[n]o further worsening of ocular sym[ptoms]." (AR 246.) Dr. Ly stated that Plaintiff "still wears eye patch of left eye secondary to diplopia. [She] states her eyes feel[] more fatigued. [She] states with prolonged use her arms feel like they [are] 'burning' but no appreciable weakness was noted." (AR 246.)

On August 4, 2008, Plaintiff returned to LAC USC and was seen by Reed L. Levine, M.D. (AR 243-45.) Dr. Levine noted that Plaintiff felt that the ptosis was stable but not improving, but his exam indicated that the condition "may be improved somewhat." (AR 243-44.) Plaintiff's medication and treatment plan was adjusted. (AR 244-45.) An MRI was recommended, although Plaintiff indicated that an MRI performed in 2006 had been normal. (AR 245.)

On December 1, 2008, Vidya A. Hawkins, D.O., saw Plaintiff at LAC USC. (AR 247-48.) Plaintiff's medication was adjusted and tests were ordered. (AR 248.) Plaintiff was referred to neuro-ophthalmology for evaluation. (AR 248.)

On August 8, 2009, Plaintiff was seen by Phuc V. Le, M.D., at LAC USC. Plaintiff reported that she received no benefit from medication and that her "diplopia and droopy lid is stable over the course of the day." (AR 256.) Plaintiff also reported that "[t]he double vision has been stable over the past two years" and that "[t]he droopy lid has been stable from the beginning" of her symptoms in May 2006. (AR 256.) Dr. Le noted that Plaintiff's diagnosis of myasthenia gravis was "unclear" because "she never had any response to [the medication] mestinion." (AR 257.) Dr. Le indicated that Plaintiff had a history of Graves. (AR 257.) A orbicularis biopsy was recommended. (AR 257.)

Dr. Le recommended that Plaintiff "alternate [eye] patch rather than just patch the left eye, which she has been doing for the past 4 years." (AR 257.)

On November 2, 2009, Plaintiff was seen by Ani Khondkaryan, M.D., at LAC USC. A biopsy had been performed in August 2009, which was "positive for ragged red fibers." (AR 258.) Plaintiff was diagnosed with chronic progressive external ophthalmoplegia ("CPEO").[4] (AR 258.) Treatment options were discussed, including surgery, although Dr. Khondkaryan explained that given Plaintiff's condition, "symptoms would not be controlled long-term with surgery." (AR 259.) Plaintiff agreed to proceed with surgery. (AR 259.)

**B.     Administrative Hearing**

The Commissioner denied Plaintiff's applications initially and again on reconsideration; consequently, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (AR 54-66.) On July 29, 2009, ALJ Thomas Gaye held a hearing in which Plaintiff, represented by counsel, and vocational expert ("VE") Ken Ferra testified. (AR 29-51.)

**1.     Plaintiff's Testimony**

The ALJ informed Plaintiff that the time frame concerning her disability ranged from 2001 through the end of 2006 and that "current events don't matter much at all." (AR 33.) Plaintiff testified that she was 43 years old at the time of the hearing, had two adult children, and lived with her parents and her daughter. (AR 35, 38.) Plaintiff completed one year of college. (AR 35.) Plaintiff stated that her parents had been supporting her, but that in November or December 2008, her daughter received "community connection through the welfare department" so Plaintiff was being paid to watch her grandchildren. (AR 35-36.)

Plaintiff testified that she suffered from a thyroid condition and that she was "anxious all the time" and had "trouble speaking sometimes." (AR 37.) Plaintiff was treated with radioactive iodine in 2006, and a few months later "started having the problems with [her] vision, not being able to keep either eye open, the double vision then the – the muscle, not really weakness but pains in the muscles, arms, legs and things like that." (AR 38.) Plaintiff stated that her condition had not

---

[4] External ophthalmoplegia is defined as "paralysis of the external ocular muscles." *Dorland's* 1350.

6

improved and that she was only able to watch her grandchildren because her parents would help her. (AR 38.)

Plaintiff stated that she was given some medication in 2006 to treat her condition, and that she decided to wear an eyepatch on her own because her "eyes wouldn't stay open and [she] would see double" without the patch. (AR 39.) Plaintiff said that the double vision was "constant," and that she also suffered from "aches in the muscles," "being tired," "having to rest because of being tired," and "not being able to keep [her] eye open." (AR 39-40.) Plaintiff stated that her eye was affected by heat. (AR 40.) Plaintiff had trouble focusing her eye while reading and "literally had to hold it open sometimes," although that "doesn't happen all the time" and would occur at "random." (AR 40-41.) Plaintiff testified that her depth perception was "off" when she would try to read or focus her eyes. (AR 42.) Her depth perception also affected her ability to climb stairs. (AR 46.) Plaintiff did not have positive results with medication, and the doctors "don't know what's wrong." (AR 43-44.)

Plaintiff stated that she had a "burning sensation" in her muscles if she used them "every day." (AR 44.) She was unable to lift items to an elevated level.

**2.    VE Testimony**

The ALJ asked the VE whether a hypothetical person of Plaintiff's "age, 35 at the onset, education and past work experience"; who could perform light level work with no climbing of ropes, ladders, or scaffolding; and who had limited depth perception which prevented concentrated exposure to hazards defined as unprotected heights or dangerous machinery; could perform Plaintiff's past work. (AR 47-48.) The VE testified that Plaintiff was unable to work at her past job as a packer, but that "depth perception is not an issue for the clerk." (AR 48.) The VE stated that Plaintiff's former position as a clerk typist was light and semi-skilled, and could accommodate her ability to focus. (AR 48-49.)

**C.    ALJ's Decision**

On August 31, 2009, the ALJ issued a decision finding Plaintiff not disabled since September 15, 2001, the alleged disability onset date, through the last DIB date insured of December 31, 2006. (AR 19-27.) Specifically, the ALJ found that (1) Plaintiff met the insured status requirements of the

Act through December 31, 2006; (2) Plaintiff had not engaged in substantial gainful activity from September 15, 2001, the alleged disability onset date, through the last date insured; (3) Plaintiff had severe impairments of myasthenia gravis and hypothyroidism; (4) Plaintiff did not have an impairment or combination of impairments that met or equaled one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) through the last date insured, Plaintiff had the RFC to perform light work as defined in 20 C.F.R. Part 404.1567(b), except Plaintiff could not climb ladders, ropes, or scaffolds and should avoid the need for precise depth perception and concentrated exposure to hazardous heights and machinery; (6) through the last date insured, Plaintiff was capable of performing past relevant work as a clerk typist; and (7) Plaintiff had not been under a disability as defined in the Social Security Act from September 15, 2001, through December 31, 2006, the date last insured. (AR 24-27.)

Plaintiff sought review of this decision before the Appeals Council. On August 8, 2011, the Appeals Council denied review. (AR 5-7.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

**D.    Plaintiff's Contentions on Appeal**

Plaintiff asked for and received an extension of time from the Appeals Council to file her complaint. (AR 1-3.) On October 19, 2011, Plaintiff, representing herself in pro se, filed a complaint before this Court seeking review of the ALJ's decision. (Doc. 1.) Plaintiff contends that the Social Security Administration ("SSA") failed to contact her doctor to "get a better understanding" of the intensity of her condition, and failed to consider that her condition has lasted continuously for "at the very least 6 years." (Doc. 21, p. 10.)

## III. SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial

evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV. APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the

requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform his past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. **DISCUSSION**

Plaintiff asserts two legal claims. The first claim is that the SSA should have contacted her doctor "not only for medical records but also to find out such things as the intensity and persistence of pain and other symptoms." (Doc. 21, p. 10.) Plaintiff argues that because representatives of SSA "can only read about [her] medical findings, it would be necessary to contact [her] doctor to get a better understanding of what's going on with [her] and what [her] weekly/monthly visits reveal as the doctor wouldn't necessarily put everything in writing." (Doc. 11, pp. 10-11.)

The second legal claim asserted by Plaintiff is that her "impairments have lasted at the very least 6 years and since it is a condition that has no cure, it is continuous. [She] will have it until [her] death." (Doc. 21, p. 10.)

Defendant contends that the medical records submitted were sufficient to assess Plaintiff's condition and that there was no need to recontact her primary care physician to further develop the record. (Doc. 22, 6:7-18.) Further, the ALJ found that Plaintiff was not fully credible and that her allegations of disabling symptoms and limitations were inconsistent with her activities of daily living and her doctors' findings. (Doc. 22, 6:25-7:13.) Accordingly, as the ALJ has provided a rational interpretation based on substantial evidence, the decision should be affirmed. (Doc. 22, 7:11-15.)

**A.    The ALJ Had No Duty to Further Develop the Record**

    **1.    Legal Standard**

The ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered. *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005). "The

ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." *Id.* (citation omitted).

**2.  Analysis**

Plaintiff contends that the ALJ[5] did not contact her primary care physician to "get a better understanding" of her condition but instead only "read about [her] medical findings." (Doc. 21, p.10.) Plaintiff states that her doctor "wouldn't necessarily put everything down in writing." (Doc. 21, pp. 10-11.) As such, it appears that Plaintiff is asserting that the ALJ should not have relied only upon the submitted medical records, but should also have recontacted the physician directly to gain further information.

The ALJ's duty to recontact a medical source is only triggered where the medical record is insufficient to make a disability finding or the evidence conflicts to the extent that the ALJ cannot reach a conclusion. *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) (citation omitted). As such, there must be ambiguous evidence or the record must be inadequate to allow for proper evaluation of evidence. *Id.* The Ninth Circuit has held that there is no duty to recontact doctors if the evidence in the record is adequate for the ALJ to make a determination. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). ("The claimant bears the burden of proving that she is disabled. An ALJ is required to recontact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination." (citations and quotation marks omitted)).

Here, the ALJ reviewed the medical records submitted and was able to make a determination of Plaintiff's abilities based on those records. The ALJ found that

> the weight of the objective medical evidence does not support the claimant's claim of disabling limitations to the degree alleged. Her myasthenia gravis is being treated with medication. Her anxiety and tremors improved after i131 radioabulation to thyroid. While she has been alleging muscle weakness more proximal than distal[,]

---

[5] Plaintiff's reply brief states that she "never implied that the ALJ should" have contacted her physician," but "that SSA should have done this." (Doc. 24, p. 4.) It is not clear what distinction Plaintiff is attempting to make between the ALJ and SSA, but ultimately it is the ALJ who made the final determination as to Plaintiff's disability and it is the ALJ's duty to fully develop the record. *See Webb*, 433 F.3d at 687.

11

> neurological examinations did not support limitations except for ptosis, left greater than right. Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor. Yet a review of the record in this case reveals no restrictions recommended by the treating doctor.

(AR 26.)

The ALJ reviewed the medical evidence of record, and found that Plaintiff had the RFC to perform light work, with no climbing of ladders, ropes, or scaffolds and with the need to avoid precise depth perception and concentrated exposure to hazardous heights and machinery. (AR 24-25.) In so finding, the ALJ gave "great weight" to the opinions and findings of Plaintiff's treating physicians because of the length of the treatment relationship. (AR 26.) Thus, having relied heavily upon the findings of Plaintiff's doctors to determine the RFC, there was no inadequacy or ambiguity in the record that would have required the ALJ to recontact those doctors.

Plaintiff points to no conflict or insufficiency in the medical record that would require the ALJ to seek clarification from the physicians who had treated Plaintiff, but instead speculates that the ALJ could have received further information by recontacting her doctors. Plaintiff is essentially arguing that the ALJ was under a *sua sponte* duty to solicit formal and current opinions from her physicians – even though the medical evidence of record was clear and consistent, providing sufficient evidence to decide the claim. There simply is no such duty to collect further evidence absent inconsistency, conflict, or a lack of evidence in the medical record such that additional or supplement medical evidence is necessary to make a decision on the claim. As such, the ALJ had no duty to further develop the record and to recontact Plaintiff's doctors.

**B.   The ALJ Properly Considered Plaintiff's Impairments Through Her Last Insured Date for DIB**

**1.   Legal Standard**

For the purposes of DIB, a claimant becomes disabled when she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1). To qualify for benefits under DIB, a claimant must demonstrate that she is disabled prior to her last insured date. *See id.* § 423(c);

*Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 589 (9th Cir. 1998). As such, a plaintiff bears the burden of proof to show that she was "either permanently disabled or subject to a condition which became so severe as to disable her prior to the date upon which her disability insured status expire[d]." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir.1995) (citations omitted).

**2.  Analysis**

Plaintiff asserts that she should be found to be disabled because her "impairments have lasted at the very least 6 years and since it is a condition that has no cure, it is continuous. [She] will have it until [her] death." (Doc. 21, p. 10.)[6] It appears that Plaintiff assumes that if her condition lasts longer than 12 months, she should be considered disabled.  This is an incorrect reading of the Act. The fact that Plaintiff has an impairment that lasts continuously for over 12 months does not necessarily equate to disability.  Individuals are considered disabled only if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also cannot, considering their age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(2)(A); *see also Mayes*, 276 F.3d at 460.

To qualify for DIB, Plaintiff would have to show that she could not have engaged in either her previous work or any other kind of substantial gainful work *prior to her last insured date*.  *See* 42 U.S.C. § 423(c).  Here, the ALJ determined that Plaintiff last met the insured status requirements of the Act on December 31, 2006.  (AR 24.)  Plaintiff does not dispute that finding.  As such, Plaintiff would need to show that she became disabled on or before December 31, 2006, and could not have performed work by that date.  *See Lester v. Chater*, 81 F.3d 821, 825 (9th Cir. 1995).

The ALJ considered the period between Plaintiff's alleged onset date of September 15, 2001, and Plaintiff's last insured date of December 31, 2006, and found Plaintiff was not disabled during that time.  (AR 24-27.)  The ALJ noted that the medical records showed improvements to Plaintiff's condition during that period based on treatment and medication.  (AR 26.)  The ALJ determined

---

[6] The Court notes that Defendant's sparse opposition brief, which contains approximately one page of analysis, essentially fails to address this argument by Plaintiff but merely asserts that the ALJ was not required to develop the record and that his decision was supported by substantial evidence in the record. (*See* Doc. 22, pp. 6-7.)  However, in considering Plaintiff's argument, the Court finds, as discussed below, that Plaintiff's contentions are legally insufficient.

1  Plaintiff's RFC based on her medical condition through the date last insured and, based upon
2  testimony by the VE during the hearing, found that Plaintiff was capable of performing her past
3  relevant work as a clerk typist. (AR 27; *see also* AR 47-49.) As such, the ALJ found that Plaintiff
4  was not disabled prior to her last insured date. 42 U.S.C. § 423(d)(2)(A).

5  In the reply brief, Plaintiff asserts that "[a]t the hearing, [she] was not allowed to plead [her]
6  case past the year 2006," and "[a]t the current moment [her] thyroid levels are once again out of
7  control." (Doc. 24, pp. 4-5.) Plaintiff contends that these conditions developed prior to December
8  2006, and appears to be asserting that they have worsened since then. (Doc. 24, p. 5.) However, the
9  time frame at issue in this case is prior to December 31, 2006, and any purported worsening of
10 Plaintiff's condition since that time is not at issue. During the period in question, the ALJ
11 determined that Plaintiff was able to work, and Plaintiff fails to counter those findings. As the ALJ's
12 reasons were properly supported by substantial evidence in the record, the Court must uphold the
13 ALJ's findings. *See Lewis*, 498 F.3d at 911.

### VI. **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Stacy Matthews.

IT IS SO ORDERED.

**Dated:   January 22, 2013**              /s/ Sheila K. Oberto
                                   UNITED STATES MAGISTRATE JUDGE